# STATE OF MICHIGAN

# COURT OF APPEALS

RIC-MAN CONSTRUCTION, INC.,

UNPUBLISHED
January 17, 2017

Plaintiff/Counter-Defendant-
Appellee,

v

No. 329159
Wayne Circuit Court
LC No. 11-011315-CZ

NEYER, TISEO & HINDO LTD. d/b/a NTH
CONSULTANTS, LTD.,

Defendant/Counter-Plaintiff-
Appellant.

Before: TALBOT, C.J., and JANSEN and HOEKSTRA, JJ.

PER CURIAM.

In this dispute between a contractor and project engineer, defendant/counter-plaintiff Neyer, Tiseo & Hindo LTD., d/b/a NTH Consultants, LTD. (NTH), appeals by leave granted[1] the trial court's August 14, 2015 opinion and order granting in part and denying in part its motion for summary disposition. Plaintiff/counter-defendant Ric-Man Construction, Inc. cross-appeals a portion of the same opinion and order. We affirm in part, reverse in part, and remand for further proceedings.

## I. FACTS

The instant dispute revolves around the rehabilitation of the Oakland-Macomb Interceptor (the OMI). As background:

> The OMI is an intercounty drain formerly owned by Detroit. In 2009, the [Oakland-Macomb Interceptor Drain Drainage District (OMIDDD)] was formed and purchased the OMI. . . . At the time the OMIDDD acquired the OMI, the system was in a serious state of disrepair. The OMIDDD was tasked with rehabilitating the system. An expensive, multi-year rehabilitation project was

---

[1] *Ric-Man Construction, Inc v Neyer, Tiseo & Hindo LTD*, unpublished order of the Court of Appeals, entered February 17, 2016 (Docket No. 329159).

approved, and is just now nearing completion. The project was funded largely by apportionments paid by 23 communities that connected to the OMI and used it to deliver wastewater to the Detroit Water and Sewerage Department (DWSD).[2]

The dispute in this matter revolves around one portion of the rehabilitation project. Specifically, at issue is the construction of Control Structure 6 (CS-6). Generally speaking, construction of this structure required excavating 75 feet deep underground to install a gate that could be used to facilitate repairs to the sewer system in the future. The project was designed by NTH. NTH's plans were made available to contractors, who bid on the project. Ric-Man won the bid, and entered into an agreement that included the construction of CS-6. This contract, which actually consists of several documents, is referred to as the Prime Contract. The Prime Contract designated NTH as the OMIDDD's representative during the construction phase. NTH would oversee the project, ensuring that Ric-Man's work conformed to NTH's design. NTH was also given responsibility to make determinations regarding problems or disputes that might arise during construction.

During construction, Ric-Man encountered two primary issues. First, Ric-Man, on advice of a supplier and several consultants, believed the upper temporary earth retention system (TERS) designed by NTH was defective. The TERS is a safety system, made of steel, that is designed to keep earth from collapsing as workers excavate deeper into the ground. Ric-Man believed that the system as designed by NTH was not sufficient to prevent a collapse. Ric-Man brought its concerns to NTH, but NTH maintained that the system it designed was sufficient. Eventually, Ric-Man constructed the TERS as it believed was necessary to protect its workers.

The second issue involves the soil conditions encountered at the work site. Based on geotechnical reports prepared by NTH, Ric-Man expected to encounter "stiff silty clay and medium compact to very compact silty sands and silts . . . ." However, as it excavated, Ric-Man found that the soil was materially different. As a result, Ric-Man had to begin an emergency grouting program, incurring additional expenses. Ric-Man sought a time extension related to this issue, but the request was denied.

In 2011, Ric-Man and the OMIDDD agreed to arbitrate their disputes. Shortly thereafter, Ric-Man filed the instant suit against NTH. The complaint raised five counts: professional negligence, intentional misrepresentation, tortious interference with contract, negligent misrepresentation, and defamation. On NTH's motion, the trial court granted summary disposition on all claims in NTH's favor, concluding that these claims should be submitted to arbitration along with Ric-Man's claims against the OMIDDD. However, on appeal, this Court reversed, holding that NTH could not compel arbitration between itself and Ric-Man.[3]

---

[2] *Marrocco v OMIDDD*, unpublished opinion per curiam of the Court of Appeals, issued June 16, 2016 (Docket No. 326575), unpub op at 2.

[3] *Ric-Man Const, Inc v Neyer, Tiseo & Hindo Ltd*, unpublished opinion per curiam of the Court of Appeals, issued March 26, 2013 (Docket No. 309217).

After the matter returned to the trial court, NTH moved for summary disposition on all counts. Ric-Man agreed that its intentional misrepresentation claim failed as a matter of law, but contested the motion with regard to the remaining counts. After receiving a multitude of briefs from the parties and hearing their arguments, the trial court issued its opinion. For the most part, the trial court denied NTH's motion. The trial court did hold that Ric-Man could not recover the lost profits of a separate company, Mancini Enterprises, LLC, owned by the same three brothers that own Ric-Man. NTH filed the instant application for leave to appeal, which this Court granted. Ric-Man then filed a cross-appeal, challenging the trial court's decision that it could not pursue a claim of lost profits on behalf of Mancini Enterprises.

The issues raised on appeal generally fit into two categories: those challenging the merits of the various counts of the complaint, and those addressing what damages Ric-Man may recover. We begin with the arguments addressing the viability of the individual counts.

## II. DUTY OF CARE – PROFESSIONAL NEGLIGENCE AND NEGLIGENT MISREPRESENTATION

The first issue concerns Ric-Man's professional negligence and negligent misrepresentation counts. These counts allege that NTH negligently designed the TERS and was negligent in reporting the soil conditions at the work site. NTH contends that both claims must fail because neither alleges the existence of a duty of care separate and distinct from its agreement with the OMIDDD to design the project. We agree that the professional negligence count is barred for this reason. However, we find that the negligent misrepresentation count may proceed.

Whether a plaintiff owes a defendant a duty of care is a question of law, reviewed de novo.[4] This Court also "reviews the grant or denial of summary disposition de novo to determine if the moving party is entitled to judgment as a matter of law."[5] NTH brought its motion pursuant to MCR 2.116(C)(8) and (C)(10). As our Supreme Court has explained:

> A motion under MCR 2.116(C)(8) tests the legal sufficiency of the complaint. All well-pleaded factual allegations are accepted as true and construed in a light most favorable to the nonmovant. A motion under MCR 2.116(C)(8) may be granted only where the claims alleged are "so clearly unenforceable as a matter of law that no factual development could possibly justify recovery." When deciding a motion brought under this section, a court considers only the pleadings.

> \* \* \*

> A motion under MCR 2.116(C)(10) tests the factual sufficiency of the complaint. In evaluating a motion for summary disposition brought under this subsection, a trial court considers affidavits, pleadings, depositions, admissions,

---

[4]*Fultz v Union-Commerce Assoc*, 470 Mich 460, 463; 683 NW2d 587 (2004).

[5] *Maiden v Rozwood*, 461 Mich 109, 118; 597 NW2d 817 (1999) (citations omitted).

and other evidence submitted by the parties . . . in the light most favorable to the party opposing the motion. Where the proffered evidence fails to establish a genuine issue regarding any material fact, the moving party is entitled to judgment as a matter of law.[6]

The trial court did not identify under which provision it decided the motion. However, the question is whether Ric-Man has pleaded the existence of a duty separate and distinct from the contract between NTH and the OMIDDD. This is a purely legal question that may be decided by reference to the pleadings alone, and thus, is properly decided pursuant to MCR 2.116(C)(8).

Count I alleges a claim of "Professional Negligence." "To establish a prima facie case of negligence, a plaintiff must prove four elements: (1) a duty owed by the defendant to the plaintiff, (2) a breach of that duty, (3) causation, and (4) damages."[7] Thus, a claim of negligence cannot exist if there is no duty owed by the defendant. "The threshold issue of the duty of care in negligence actions must be decided by the trial court as a matter of law."[8] "In other words, the court determines the circumstances that must exist in order for a defendant's duty to arise."[9]

The parties rely on a number of cases in an effort to establish whether NTH owed Ric-Man a duty of care in this matter. In chronological order, those cases are *Bacco Const Co v American Colloid Co*,[10] *Nat'l Sand, Inc v Nagel Constr, Inc*,[11] *Fultz v Union-Commerce Assoc*,[12] *Keller Constr, Inc v UP Engineers and Architects*,[13] and finally, *Loweke v Ann Arbor Ceiling and Partition Co*.[14] We begin by noting that *Bacco* and *Nat'l Sand* are not binding on this Court, as neither case was decided after November 1, 1990.[15] And as an unpublished opinion, *Keller* also does not bind this Court.[16] Thus, our focus is on *Fultz* and *Loweke*, two decisions of our Supreme Court that are dispositive of the issues presented in this appeal.

---

[6] *Id.* at 119-120 (citations omitted).

[7] *Case v Consumers Power Co*, 463 Mich 1, 6; 615 NW2d 17 (2000).

[8] *Riddle v McClouth Steel Prods Corp*, 440 Mich 85, 95; 485 NW2d 676 (1992).

[9] *Id.*

[10] *Bacco Constr Co v American Colloid Co*, 148 Mich App 397; 384 NW2d 427 (1986).

[11] *Nat'l Sand, Inc v Nagel Constr, Inc*, 182 Mich App 327, 330; 451 NW2d 618 (1990).

[12] *Fultz*, 470 Mich 460.

[13] *Keller Constr, Inc v UP Engineers & Architects, Inc*, unpublished opinion per curiam of the Court of Appeals, issued July 8, 2008 (Docket No. 275379).

[14] *Loweke v Ann Arbor Ceiling and Partition Co*, 489 Mich 157; 809 NW2d 553 (2011).

[15] MCR 7.215(J)(1).

[16] MCR 7.215(C)(1).

*Fultz* involved a plaintiff who fell in an icy parking lot.[17]  The plaintiff brought a negligence claim against the snow removal service "based on its alleged failure to plow or salt the parking lot."[18]  The operative question was whether the snow removal service owed a duty to the plaintiff that could support her negligence action.[19]  Our Supreme Court explained that courts "should analyze tort actions based on a contract and brought by a plaintiff who is not a party to that contract by using a 'separate and distinct' mode of analysis.  Specifically, the threshold question is whether the defendant owed a duty to the plaintiff that is separate and distinct from the defendant's contractual obligations."[20]  Absent the existence of a separate and distinct duty, "no tort action based on a contract will lie."[21]

Several years later, in *Loweke*, our Supreme Court explained that courts had, in many cases, misapplied *Fultz*.[22]  Specifically, our Supreme Court explained that "courts have erroneously interpreted this Court's decisions as rejecting accepted tort-law principles and creating a legal rule unique to Michigan tort law, which bars negligence causes of action on the basis of a lack of duty if a third-party plaintiff alleges a hazard that was the subject of the defendant's contractual obligations with another."[23]  The Court further explained the "separate and distinct" mode of analysis:

> Under this analysis, an action would lie in contract if it was based solely on a defendant's failure or refusal to perform a contractual promise.  In contrast, an action *could* lie in either contract or in tort if a defendant negligently performs a contractual duty or breaches a duty arising by implication from the relation of the parties created by the contract[.]  In the latter category of cases, however, no tort liability would arise for failing to fulfill a promise in the absence of a duty to act that is separate and distinct from the promise made.[24]

The Court went on to explain:

> Determining whether a duty arises separately and distinctly from the contractual agreement, therefore, generally does not necessarily involve reading the contract, noting the obligations required by it, and determining whether the plaintiff's injury was contemplated by the contract.  Instead, *Fultz*'s directive is to

---

[17] *Fultz*, 470 Mich at 462.

[18] *Id*. at 461.

[19] *Id*. at 463.

[20] *Id*.

[21] *Id*.

[22] *Loweke*, 489 Mich at 163.

[23] *Id*.  The Court also explained that *Fultz* had been "misconstrued to, in essence, establish a form of tort immunity that bars negligence claims raised by a noncontracting third party."  *Id*. at 168.

[24] *Id*. (quotation marks, citations, and ellipses omitted).

determine whether a defendant owes a noncontracting, third-party plaintiff a legal duty apart from the defendant's contractual obligations to another. As this Court has historically recognized, a separate and distinct duty to support a cause of action in tort can arise by statute, or by a number of preexisting tort principles, including duties imposed because of a special relationship between the parties, and the generally recognized common-law duty to use due care in undertakings.[25]

Ultimately, the question before us is whether, under *Fultz* and *Loweke*, Ric-Man has alleged the breach of a duty separate and distinct from NTH's contractual obligations. We conclude that Count I of Ric-Man's complaint fails to allege the breach of any recognized common-law duty that is separate and distinct from NTH's contractual obligations. Each of the duties alleged by Ric-Man are obligations that NTH agreed to perform in its contract with the OMIDDD. Certainly, in performing these obligations, NTH would have a duty to "use due care in undertakings."[26] But the common-law duty to use due care in undertakings is a duty to avoid physical harm to people or property; it is not a duty to avoid economic losses to another, which is the only type of harm alleged by Ric-Man.

In *Rinaldo's Const Corp v Mich Bell Telephone Co*, a case cited favorably by the *Fultz* and *Loweke* Courts, our Supreme Court also examined a claim of negligence based on the performance of a contract.[27] As it would in *Fultz* and *Loweke*, the Court focused on the concept of duty, and specifically, whether there existed a duty separate and distinct from the contract. The Court recognized that there exists "a duty to exercise reasonable care to avoid physical harm to persons and tangible things."[28] But the Court explained that "[t]his duty . . . does not extend to intangible economic losses."[29] In this case, one could at least consider Count I of the complaint as alleging the breach of a duty to use ordinary care in undertakings. But because Ric-Man alleges only economic harm, not physical harm to persons or property, it fails to allege the existence of a recognized common-law duty separate and distinct from the contract. Much like the plaintiff in *Rinaldo*, "[w]hile plaintiff's allegations arguably make out a claim for 'negligent performance' of the contract, there is no allegation that this conduct by the defendant constitutes

---

[25] *Id*. at 169-170 (citations omitted).

[26] *Loweke*, 489 Mich at 170 (citation omitted).

[27] *Rinaldo's Const Corp v Mich Bell Telephone Co*, 454 Mich 65, 67-68; 559 NW2d 647 (1997). Specifically, the plaintiff, a construction company, experienced problems with its telephone service after moving to a new address. *Id*. at 67. The plaintiff sued the defendant telephone service for a loss of business revenue allegedly caused by the inability of customers to contact the plaintiff via telephone. *Id*. at 68.

[28] *Id*. at 84 (quotation omitted).

[29] *Id*. (quotation omitted).

tortious activity in that it caused physical harm to persons or tangible property . . . ."[30]  Thus, at least with respect to Count I of the complaint, "there is no cognizable cause of action in tort."[31]

NTH does not parse out Count IV, and simply asserts that *Fultz* and *Loweke* similarly bar Count IV of the complaint.  But the two counts are distinct.  Count IV alleges a claim of negligent misrepresentation.  "In a negligent misrepresentation action, the plaintiff must prove that 'a party justifiably relied to his detriment on information provided without reasonable care by one who owed the relying party a duty of care.' "[32]  "Michigan recognized negligent misrepresentation as a way of imposing third-party liability for the negligent performance of a contract."[33]  To further describe a claim for negligent misrepresentation, this Court has relied on the Restatement Torts, 2d, § 552,[34] which states:

> (1) One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.
>
> (2) Except as stated in Subsection (3), the liability stated in Subsection (1) is limited to loss suffered
>
>> (a) by the person or one of a limited group of persons for whose benefit and guidance he intends to supply the information or knows that the recipient intends to supply it; and
>>
>> (b) through reliance upon it in a transaction that he intends the information to influence or knows that the recipient so intends or in a substantially similar transaction.
>
> (3) The liability of one who is under a public duty to give the information extends to loss suffered by any of the class of persons for whose benefit the duty is created, in any of the transactions in which it is intended to protect them.

---

[30] *Id*. at 85.

[31] *Id*.

[32] *Roberts v Safell*, 280 Mich App 397, 406 n 2; 760 NW2d 715 (2008), aff'd 483 Mich 1089 (2009), quoting *Law Offices of Lawrence J Stockler, PC v Rose*, 174 Mich App 14, 33; 436 NW2d 70 (1989).

[33] *Id*., citing *Williams v Polgar*, 391 Mich 6, 18-23; 215 NW2d 149 (1974).

[34] See *Law Offices of Lawrence J Stockler, PC*, 174 Mich App at 35-37.

Thus, a business does owe a duty of care to those who justifiably rely on the information supplied by that business. Under Restatement Torts, 2d, § 552(2)(a), this duty extends to "the person or one of a limited group of persons for whose benefit and guidance he intends to supply the information *or knows that the recipient intends to supply it*[.]" Count IV of the complaint contends that Ric-Man was part of a group (bidders) who the OMIDDD knew would rely on the plans drafted by NTH, that these plans were materially incorrect due to NTH's negligence, and that as a result of Ric-Man's reliance on the plans, it suffered pecuniary loss. Count IV of the complaint sets forth a claim for negligent misrepresentation. *Fultz* and *Loweke* do not preclude this claim because Count IV alleges the breach of a duty, recognized at common law, that is separate and distinct from the contract between the OMIDDD and NTH. Accordingly, while Count I is barred as a matter of law, Count IV may proceed.

### III. EXCULPATORY CLAUSE

NTH argues that an exculpatory clause found within the Prime Contract bars Ric-Man's claims, and that the trial court erred by holding otherwise. We disagree. "Questions involving the proper interpretation of a contract or the legal effect of a contractual clause are also reviewed de novo."[35]

The exculpatory clause at issue states the following:

Neither Engineer's authority or responsibility under this Article 9 or under any other provision of the Contract Documents nor any decision made by Engineer in good faith either to exercise or not exercise such authority or responsibility or the undertaking, exercise, or performance of any authority or responsibility by Engineer shall create, impose, or give rise to any duty in contract, tort, or otherwise owed by Engineer to Contractor, any Subcontractor, any Supplier, any individual or entity, or any surety for or employee or agent of any of them.

The first question is whether NTH, which is not a party to the agreement containing the exculpatory clause, may nonetheless enforce it. The trial court concluded that under the Prime Contract, NTH was an agent of OMIDDD. Because NTH was the OMIDDD's agent, the trial court held that NTH could enforce the exculpatory clause, as well as other provisions of Prime Contract. Rather than dispute the trial court's decision, the parties argue over whether NTH was a third-party beneficiary to the Prime Contract who could, due to that status, enforce the exculpatory clause. Thus, with respect to the question whether NTH may enforce the exculpatory clause, no one provides any argument questioning the trial court's basis for holding that NTH could enforce the exculpatory clause and any other clause of the Prime Contract. As such, we need not question the trial court's decision in this regard.[36]

---

[35] *Hines v Volkswagen of America, Inc*, 265 Mich App 432, 443; 695 NW2d 84 (2005).

[36] See *Derderian v Genesys Health Care Sys*, 263 Mich App 364, 381; 689 NW2d 145 (2004) (if an appellant fails to address the basis for the trial court's ruling, this Court need not even consider granting relief).

The remaining question is whether the clause applies to the conduct at issue in the complaint. The trial court differentiated between allegations of negligence that occurred prior to the construction period, i.e., errors or omissions in the design of the project by NTH, and allegations of negligence that occurred during the construction phase, while NTH was to serve as project manager. It held that the exculpatory clause applied only to the latter. We agree that this is the correct interpretation of the clause.

Clearly, NTH did have two distinct roles. It first designed the project. Then, under the Prime Contract, NTH served as the OMIDDD's representative, overseeing construction of the project it had designed. The exculpatory clause is found within Article 9 of the General Conditions, one of the various documents that make up the Prime Contract. The entire purpose of this particular article is to describe NTH's duties during construction. The article itself is entitled, "Engineer's Status During Construction." The paragraphs that precede the exculpatory clause describe NTH's status as the OMIDDD's "representative *during the construction period*." NTH has a duty to visit the worksite to observe the progress being made and whether it is satisfactory. It also has the authority to authorize minor variations in the work, to interpret the contract and judge the acceptability of the work being performed, and to reject work it finds defective. The article also references other duties and responsibilities of NTH by reference to other parts of the General Conditions. The exculpatory clause is then found in the final paragraph of Article 9.

Based on the context in which it appears, we, like the trial court, conclude that the exculpatory provision applies only to NTH's conduct during the construction phase. The clause first refers to NTH's "authority or responsibility under this Article 9 or under any other provision of the Contract Documents" and NTH's decisions to "exercise or not exercise such authority or responsibility . . . ." Clearly, NTH's authority and responsibility under Article 9 is limited to the construction phase. The remainder of the "Contract Documents" similarly describe the construction phase of the project. The remaining portion of the exculpatory clause describes "the undertaking, exercise, or performance of any authority or responsibility by [NTH] . . . ." NTH contends that this portion of the clause must be read broadly to encompass any authority or responsibility of NTH whatsoever, which would include its responsibility to design the project. Such a broad reading is illogical in light of the provisions that precede the exculpatory clause. We find it clear that by referencing "any authority or responsibility," the clause refers to any authority or responsibility of NTH provided for by the Prime Contract, not any authority or responsibility NTH has ever exercised at any point in time.

Further, if we were to adopt NTH's reading of the exculpatory clause, it would render another portion of the General Conditions nugatory. As is discussed in more detail later in this opinion, Paragraphs 4.02 and 4.03 of the General Conditions restrict the scope of damages that Ric-Man could potentially recover in a suit against NTH if the soil conditions prove different than represented by NTH. Implicit in such a restriction on damages is the recognition that the claim itself is viable; there would be no need to restrict the damages available for a particular claim if the claim itself is barred. But if we were to agree with NTH's interpretation of the exculpatory clause, NTH could not be liable for erring with regard to the soil conditions present

at the work site. We must avoid interpreting the contract in such a way "that would render any part of the contract surplusage or nugatory."[37]

NTH presents several additional arguments challenging this conclusion, all of which are without merit. NTH contends that its authority and responsibility under the Prime Contract includes its design of the project. It is true that various provisions of the Prime Contract reference NTH's design or the fact that NTH designed the project. But the Prime Contract is not what gave NTH the authority or responsibility of designing the project. That responsibility was created by NTH's agreement with the OMIDDD. NTH contends that Ric-Man's complaint does not distinguish between NTH's design role and its supervisory role. The allegations of Ric-Man's complaint do not change the scope of the Prime Contract, which clearly covers the construction phase of the project. NTH also argues that because the delays occurred during the construction phase, the exculpatory clause should apply. This argument is meritless because the issue is not when delays occurred, but when NTH's allegedly negligent conduct occurred – i.e., when the duty was breached. Ric-Man alleges that NTH breached a duty when it designed the project, not during the construction of the project.

NTH also contends that the trial court erred when it concluded that the exculpatory clause only applies to errors made in good faith. We agree with this particular position. The phrase "good faith" occurs within the portion of the exculpatory clause referring to "decision[s] made by [NTH] . . . to either exercise or not exercise such authority . . . ." It is not found in other portions of the clause. A plain reading of the clause leads to the conclusion that the "good faith" language applies only to NTH's decisions to "either exercise or not exercise" any "authority or responsibility" granted to it under "Article 9 or under any other provision of the Contract Documents . . . ." There is no similar "good faith" language tied to NTH's "undertaking, exercise, or performance of any authority or responsibility . . . ."[38]

The question that still must be answered is what effect the exculpatory clause has on the different counts raised in the complaint. As we have explained, Count I fails as a matter of law because it does not allege the existence of a duty separate and distinct from NTH's contractual duties to the OMIDDD. Thus, there is no need to consider the effect of the exculpatory clause with regard to that count. Count II was dismissed by Ric-Man, and thus, is no longer at issue. With regard to Count III, the trial court explained that the exculpatory clause would not protect

---

[37] *Klapp v United Ins Group Agency, Inc*, 468 Mich 459, 468; 663 NW2d 447 (2003).

[38] The trial court and Ric-Man rely on the Wyoming Supreme Court's decision in *Excel Const, Inc v HKM Engineering, Inc*, 228 P3d 40; 2010 WY 34 (2010), which interpreted the same clause. *Id*. at 49-50. The Wyoming Supreme Court found that the clause "means that the contractor may not recover from the engineer for careless errors which were not made in bad faith, while it does not bar claims involving bad faith . . . ." *Id*. at 50. We disagree with that holding, as it ignores the specific context in which the words "good faith" appear in the clause. And of course, *Excel Const, Inc* is not binding on this Court. See *In re Jajuga Estate*, 312 Mich App 706, 723 n 7; 881 NW2d 487 (2015) (decisions from other jurisdictions are not binding on this Court).

NTH because such a claim requires a showing of an intentional or malicious conduct, and parties may not contract against liability for gross negligence or willful or wanton misconduct.[39] Neither party addresses this holding, and thus, there is no need for this Court to revisit the trial court's decision with regard to this count. Count IV, negligent misrepresentation, alleges negligence in NTH's design of the project. As discussed, the exculpatory clause does not reach NTH's conduct during the design phase. Thus, Count IV survives.

With regard to Count V (defamation), the trial court held that the exculpatory clause did not apply because a claim of defamation is inconsistent with an act of good faith. As discussed, the good faith portion of the exculpatory clause only applies to NTH's decisions to either exercise or not exercise its authority. The defamation claim does not involve a decision by NTH to either exercise or not exercise its authority, and thus, NTH's good faith, or lack thereof, is not relevant with respect to the defamation claim. That said, we find it questionable whether the exculpatory clause would reach the defamation claim. As one example, we question whether, by making false statements to the Michigan Occupational Safety and Health Administration (MIOSHA) and others, NTH was acting within its authority or responsibility granted under the Prime Contract. However, there is no briefing on the topic. Rather than decide the issue, we remand the matter to the trial court to consider whether the exculpatory clause, as interpreted by this Court, bars Ric-Man's defamation claim.

## IV. TORTIOUS INTERFERENCE WITH CONTRACT

NTH argues that the trial court erred when it allowed Ric-Man's claim of tortious interference with contract to proceed. We disagree.

"To maintain a cause of action for tortious interference, the plaintiff must establish that the defendant was a 'third party' to the contract rather than an agent of one of the parties acting within the scope of its authority as an agent."[40] It is also settled law that "corporate agents are not liable for tortious interference with the corporation's contracts unless they acted solely for their own benefit with no benefit to the corporation."[41] Hence, when an agent acts solely for its own benefit, and with no benefit to the principal, the agent is not acting within the scope of its authority. Thus, an agent who acts solely for its own benefit and not for the benefit of the principal may be liable for tortious interference with contract.

On appeal, NTH contends that as an agent, it is not an independent third party to the Prime Contract, and for that reason, cannot be liable for tortious interference with the contract. The argument ignores the basis of the trial court's decision. The trial court did not dispute that NTH was an agent; indeed, it had already held that NTH was an agent of the OMIDDD. The basis of the trial court's ruling was that the complaint alleged facts sufficient to demonstrate that even though NTH was the OMIDDD's agent, NTH acted solely for its own benefit, and thus,

---

[39] *Lamp v Reynolds*, 249 Mich App 591, 594; 645 NW2d 311 (2002).

[40] *Lawsuit Fin, LLC v Curry*, 261 Mich App 579, 593; 683 NW2d 233 (2004).

[41] *Reed v Mich Metro Girl Scout Council*, 201 Mich App 10, 13; 506 NW2d 231 (1993).

could still be liable for tortious interference.  Because NTH fails to dispute the basis of the trial court's ruling, there is no need for this Court to revisit the trial court's decision.[42]

## V.  DEFAMATION

NTH contends that the trial court erred when it allowed Ric-Man's defamation claim to proceed.  We disagree.

NTH contends that expressions of opinion cannot form the basis of a defamation claim. But as our Supreme Court has explained:

> [A] statement of "opinion" is not automatically shielded from an action for defamation because "expressions of 'opinion' may often imply an assertion of objective fact." . . . [T]he statement "in my opinion Jones is a liar" may cause just as much damage to a person's reputation as the statement "Jones is a liar." . . . Thus, a statement of opinion that can be proven to be false may be defamatory because it may harm the subject's reputation or deter others from associating with the subject.[43]

Thus, NTH's belief that a statement of opinion cannot form the basis of a defamation claim is simply not accurate under Michigan law.  Ric-Man cites an email sent by a representative of NTH to a MIOSHA representative as defamatory.  The email states:

> As we discussed, R[ic-Man] has been engaged in an ongoing campaign to obtain a change order and increased compensation on the project, and has resorted to a variety of questionable tactics, including (but not limited to) intentional misinterpretation of their own consultant's statements to you, and concealing the April 29, 2009 meeting from NTH and the [OMIDDD].

This statement can easily be interpreted as a statement of fact, not simply an opinion.  But even if considered an opinion, the statement certainly fits within those types of "opinions" that may nonetheless be considered defamatory.  Accordingly, summary disposition is inappropriate.

NTH's only other argument is that its statement was privileged, an argument rejected by the trial court.  As this Court has explained:

> The determination whether a privilege exists is one of law for the court.  The elements of a qualified privilege are (1) good faith, (2) an interest to be upheld, (3) a statement limited in its scope to this purpose, (4) a proper occasion, and (5) publication in a proper manner and to proper parties only.[44]

---

[42] *Derderian*, 263 Mich App at 381.

[43] *Smith v Anonymous Joint Enterprise*, 487 Mich 102, 128; 793 NW2d 533 (2010).

[44] *Prysak v RL Polk Co*, 193 Mich App 1, 14-15; 483 NW2d 629 (1992) (citations omitted).

NTH fails to address any of these elements. It simply cites the elements and explains that "[b]ecause the purported opinion was made to OMIDDD while acting as a representative for OMIDDD and to MIOSHA, a government agency responsible for overseeing safety, NTH's opinions were privileged." It is well-established that an appellant may not simply "announce a position and leave it to this Court to discover and rationalize the basis for the claim."[45] By failing to properly address the merits of its contention of error, NTH has waived the issue.[46]

## VI. DIFFERING SITE CONDITIONS CLAUSE

The remaining arguments on appeal address what damages Ric-Man may potentially receive if it succeeds on its claims. More to the point, the parties dispute whether Ric-Man may recover lost profits. These lost profits fall into two categories: (1) lost profits on construction projects that Ric-Man alleges it lacked the resources to bid because it was addressing problems with CS-6, and (2) lost profits that Mancini Enterprises, a separate company owned by the same three brothers that own Ric-Man, could have realized from the purchase of real estate in Florida.

The first argument presented by NTH concerns what the parties refer to as the "differing site conditions" clause. We agree that the trial court's interpretation of this clause was erroneous.[47]

Article 4 of the General Conditions is entitled "Availability of Lands; Subsurface and Physical Conditions; Hazardous Environmental Conditions; Reference Points[.]" Paragraph 4.02 specifically addresses "Subsurface and Physical Conditions[.]" This paragraph states:

---

[45] *Nat'l Waterworks, Inc v Int'l Fidelity & Surety, Ltd*, 275 Mich App 256, 265; 739 NW2d 121 (2007).

[46] *Id*.

[47] In this issue, NTH also asks us to consider the effect of another clause, found in Article 12 of the general conditions. We decline to do so for several reasons. First, this particular clause was not cited by NTH in its application for leave to appeal. As ordered by this Court, this appeal is "limited to issues raised in the application and supporting brief." *Ric-Man Construction, Inc v Neyer, Tiseo & Hindo Ltd*, unpublished order of the Court of Appeals, entered February 17, 2016 (Docket No. 329159). Second, the statement of the question presented clearly asks this Court to consider a single clause – the "differing site conditions" clause found in Article 4 of the General Conditions. Because the clause found in Article 12 of the General Conditions has not been raised in NTH's statement of the question presented, this Court need not address the effect of that particular clause. *Ypsilanti Fire Marshal v Kircher*, 273 Mich App 496, 543; 730 NW2d 481 (2007) (issues not specifically raised in the statement of questions presented are abandoned). Finally, despite the extraordinary number of briefs submitted to the trial court, we have been been unable to find any point at which NTH suggested that this clause was relevant or precluded recovery of consequential damages. "Issues raised for the first time on appeal are not ordinarily subject to review." *Booth Newspapers, Inc v Univ of Mich Bd of Regents*, 444 Mich 211, 234; 507 NW2d 422 (1993).

-13-

A. *Reports and Drawings:* The Supplementary Conditions identify:

1.   those reports of explorations and tests of subsurface conditions at or contiguous to the Site that [NTH] has used in preparing the Contract Documents;

2.   those drawings of physical conditions in or relating to existing surface and subsurface structures at or contiguous to the Site (except Underground Facilities) that [NTH] has used in preparing the Contract Documents.

B.   *Limited Reliance by Contractor on Technical Data Authorized:*   [Ric-Man] may rely upon the general accuracy of the "technical data" contained in such reports and drawings, but such reports and drawings are not Contract Documents. Such "technical data" is identified in the Supplementary Conditions.  Except for such reliance on such "technical data," Contractor may not rely upon or make any claim against [the OMIDDD] or [NTH], or any of their Related Entities with respect to:

1.   the completeness of such reports and drawings for [Ric-Man]'s purposes, including, but not limited to, any aspects of the means, methods, techniques, sequences, and procedures of construction to be employed by [Ric-Man], and safety precautions and programs incident thereto; or

2.   other data, interpretations, opinions, and information contained in such reports or shown or indicated in such drawings; or

3.   any Contractor interpretation of or conclusion drawn from any "technical data" or any such other data, interpretations, opinions, or information.

Paragraph 4.03 of the General Conditions explains what steps are to be taken in the event Ric-Man "believes that any subsurface or physical condition . . . is uncovered or revealed" to be different than provided by the "technical data" referenced in the preceding paragraph.  Under such circumstances, Ric-Man must provide notice to the OMIDDD and NTH and cease work. NTH must then review the condition and determine how to proceed.   Under certain circumstances, adjustments to the contract price and contract time must be made.  Paragraph 4.03(C)(3) provides that:

If [the OMIDDD] and [Ric-Man] are unable to agree on entitlement to or on the amount or extent, if any, of any adjustment in the Contract Price or Contract Times, or both, a Claim may be made therefore as provided in Paragraph 10.05. *However, [the OMIDDD] and [NTH] shall not be liable to [Ric-Man] for any claims, costs, losses, or damages (including but not limited to all fees and charges of engineers, architects, attorneys, and other professionals and all court or arbitration or other dispute resolution costs) sustained by [Ric-Man] on or in connection with any other project or anticipated project.*  [emphasis supplied.]

In this case, one of the disputes involves a claim that the soil conditions were not as represented by NTH in the project designs.  Clearly, the above language applies to that portion of Ric-Man's claim.  Under this clause, Ric-Man's claimed damages for lost profits sustained in

relation to other projects or other anticipated projects are not recoverable. We disagree, however, with NTH's belief that this clause applies to the part of the claim stemming from NTH's design of the TERS. This part of the claim does not concern a differing soil condition, but a design defect in a safety system.[48]

NTH contends that the language of Paragraph 4.03(C)(3) is not limited to claims involving differing site conditions. And in truth, if one reads this specific paragraph in isolation, it does not speak of differing site conditions. But contracts must be read as a whole.[49] Reading the paragraph as NTH suggests completely divorces the paragraph from the context that surrounds it. Clearly, the type of claims at issue in Paragraph 4.03(C)(3) are those encompassed by the multitude of provisions that precede it: claims involving differing subsurface or physical conditions. NTH's suggested reading of the provision must be rejected.

The trial court erred, however, when it limited the scope of Paragraph 4.03(C)(3) to NTH's conduct during the construction phase of the project. Ric-Man believes that Paragraph 4.03(C)(3) must be read "through" the exculpatory clause, which, as discussed, is limited to NTH's conduct during the construction phase of the project. There is absolutely no basis for such a reading of Paragraph 4.03(C)(3). Paragraph 4.03(C)(3) does not reference Article 9 or any of its provisions. Nor do the two provisions encompass the same subject matter. The exculpatory clause eliminates liability entirely for certain conduct. Paragraph 4.03(C)(3) allows for certain claims, but restricts the scope of damages available to Ric-Man.

Further, reading Paragraph 4.03(C)(3) as the trial court and Ric-Man suggest would eliminate the limitations on damages altogether. The entire point of Paragraph 4.03 of the General Conditions is to address liability in the event that NTH's reports and drawings regarding subsurface and physical conditions at the work site prove inaccurate. These reports and drawings were, by necessity, prepared before the construction phase began. Thus, if the limitations stated in Paragraph 4.03(C)(3) apply only to negligence occurring in the construction phase, there is no conduct to which these same limitations could apply. Contract language must be read in such a way to avoid rendering any language surplusage or nugatory.[50] Thus, we cannot interpret Paragraph 4.03(C)(3) in the same manner as the trial court and Ric-Man.[51] The paragraph is not limited to NTH's conduct during the construction phase of the project.

---

[48] NTH fails to explain how any problems with the TERS system resulted from differing site conditions.

[49] *Detroit Pub Schools v Conn*, 308 Mich App 234, 251-252; 863 NW2d 373 (2014).

[50] *Klapp*, 468 Mich at 468.

[51] Ric-Man also contends that NTH was not a third-party beneficiary to the Prime Contract, and thus, may not enforce the differing site conditions clause. As discussed in Issue III, this argument ignores the trial court's reason for permitting NTH to enforce clauses of the agreement – agency.

## VII.  LIMITATIONS ON "CLAIMS"

The second contractual provision cited by NTH as a bar to Ric-Man's claims for lost profits is found in Article 10 of the General Conditions.  Article 10 of the General Conditions is entitled "Changes in the Work; Claims."  Paragraph 10.05 explains the process for resolving "Claims," a term that is specifically defined earlier in the General Conditions.  Pursuant to Paragraph 10.06:

10.06  Certain Limitation on Contractor Claims for Damages

A.  [Ric-Man] agrees that in any Claim, its damages will be computed pursuant to Article 1, and in no case shall its damages exceed the actual cost incurred to perform the Work plus anticipated profit arising from the Work.

B.  In any Claim or any other suit or proceeding against the [OMIDDD], in addition to any costs excluded by Paragraph 11.02.B, [Ric-Man] waives damages incurred by [Ric-Man] for [other specific areas of damages].

NTH contends that Paragraph 10.06(A) precludes Ric-Man from seeking its claimed consequential damages.  This is because NTH believes that the instant complaint is a Claim, and thus, the limitations found in Paragraph 10.06(A) apply.  Ric-Man's argument in response is identical to its treatment of the differing site conditions clause.  For the same reasons discussed in the prior issue, we find Ric-Man's argument unavailing.

That said, we do not find that Paragraph 10.06 has any application to this matter because a Claim under the General Conditions does not include claims of any sort made against NTH.  We reach this conclusion because the process for resolving Claims is not compatible with claims made against NTH.  Paragraph 10.05, entitled, "Claims," first explains that "[a]ll Claims . . . shall be referred to [NTH] for decision."  NTH then has 30 days to render its decision.  NTH's decision is "final and binding upon [the OMIDDD] and [Ric-Man], unless [the OMIDDD] or [Ric-Man] invoke the dispute resolution procedure set forth in Article 16 within 30 days of such denial."  Under Article 16 of the General Conditions, any decision by NTH is "final and binding 30 days after receipt of written notice of [NTH]'s action or decision unless, within that time period, [the OMIDDD] or [Ric-Man] gives to the other party written notice of intent to submit the Claim to a process of bilateral negotiations as set forth below."  A negotiation process between the OMIDDD and Ric-Man follows.  "If the Claim is not resolved by negotiation, [NTH]'s action . . . shall become final and binding 30 days after termination of the negotiations unless, within that time period, [the OMIDDD] or [Ric-Man] agrees with the other party to submit the Claim to another dispute resolution process."

The procedure described above is clearly aimed at resolving disputes between the OMIDDD and Ric-Man.  It is also entirely incompatible with claims raised against NTH.  It makes little sense for NTH to serve as the arbiter of claims against itself.  It also makes no sense for the OMIDDD and Ric-Man to engage in negotiations or other alternative dispute resolution procedures when a claim is made against NTH.  The above process makes complete sense, however, if it is understood that Claims exist only between Ric-Man and the OMIDDD.

NTH contends that claims against it are included within the definition of a Claim. A Claim is defined as:

10. *Claim* - A demand, assertion, or legal or arbitration proceeding by [the OMIDDD] or [Ric-Man] seeking an adjustment of Contract Price or Contract Times, or both, or other relief with respect to the terms or performance of the Contract. A demand for money or services by a third party is not a Claim.

The claims at issue in this suit could conceivably fit into the definition of a Claim under this provision. Ric-Man's complaint could be described as "[a] . . . legal . . . proceeding by . . . [Ric-Man] seeking . . . other relief with respect to the terms or performance of the Contract." But the definition of a Claim does not explicitly provide that a claim against NTH is a Claim as defined by the General Conditions. And ultimately, this Court must read the contract as a whole, "giving harmonious effect, if possible, to each word and phrase."[52] If a Claim includes those made by Ric-Man against NTH, the procedures for resolving such a Claim make little sense. Reading the definition of a Claim in conjunction with the provisions covering the resolution of such Claims, the only logical, harmonious result is to limit the definition of a Claim to those brought by the OMIDDD or Ric-Man against each other.

NTH contends that including Ric-Man's claims against it is consistent with Paragraph 10.06. NTH explains that subsection (A) of this paragraph places limitations on "any Claim," but subsection (B) places limitations only on "any Claim or any other suit or proceeding against the [OMIDDD]." NTH argues that there must be a difference between "any Claim," as discussed in the first subsection, and Claims against the OMIDDD, as discussed in the second. NTH contends that the difference is that "any Claim" includes claims against the OMIDDD and against NTH.

We reject NTH's strained reading of paragraph 10.06. Subsection (A) describes how Ric-Man's damages will be calculated with regard to Claims, while subsection (B) describes limitations applicable both to Claims and to other suits or proceedings. Both subsections, however, refer to issues raised by Ric-Man against the OMIDDD. The additional language "against the [OMIDDD]" found in subsection (B) is necessitated because that subsection describes both Claims and "other suit[s] or proceeding[s] . . . ." This additional language does not recognize different potential defendants, but rather, different types of actions, all of which may be brought by Ric-Man against the OMIDDD.

## VIII. COLLATERAL ESTOPPEL

NTH also contends that Ric-Man is collaterally estopped from seeking lost profits in this matter because in its arbitration claim against the OMIDDD, the arbitration panel declined to award the same lost profits to Ric-Man. We disagree.

As our Supreme Court has explained:

---

[52] *Wilkie v Auto-Owners Ins Co*, 469 Mich 41, 50 n 11; 664 NW2d 776 (2003).

Generally, for collateral estoppel to apply three elements must be satisfied: (1) a question of fact essential to the judgment must have been actually litigated and determined by a valid and final judgment; (2) the same parties must have had a full and fair opportunity to litigate the issue; and (3) there must be mutuality of estoppel. Mutuality of estoppel requires that in order for a party to estop an adversary from relitigating an issue that party must have been a party, or in privy to a party, in the previous action. In other words, the estoppel is mutual if the one taking advantage of the earlier adjudication would have been bound by it, had it gone against him.[53]

It is also well established that collateral estoppel "applies to factual determinations made during grievance hearings or arbitration proceedings."[54]

In the arbitration proceeding, Ric-Man brought breach of contract claims against the OMIDDD that sought damages for the problems with the TERS design and the soil conditions encountered on the project. The arbitration panel found in favor of Ric-Man with respect to both claims, and awarded Ric-Man substantial direct damages. It declined, however, to award Ric-Man its claimed lost profits, stating that Ric-Man "failed to meet its burden that the claimed consequential damages proximately resulted from any breach of contract by [the] OMIDDD." The question is whether this finding prevents Ric-Man from seeking the same consequential damages in this case.

The trial court found that the issue decided by the arbitration panel was not identical to that at issue in this case, and thus, collateral estoppel did not apply. In doing so, the trial court noted the differences between contract damages and tort damages. And indeed, there is a difference. "In a breach of contract case, the plaintiff must establish a causal link between the asserted breach of contract and the claimed damages."[55] Only those damages "that are the direct, natural, and proximate result of the breach[]" may be recovered.[56] Contract damages also must meet a standard of foreseeability. The damages available in a breach of contract case are those that arise naturally from the breach, or which can reasonably be considered to have been within the contemplation of the parties at the time the contract was made.[57] The standard is objective; damages that the breaching party either knew or should reasonably have known would occur are

---

[53] *Monat v State Farm Ins Co*, 469 Mich 679, 683-685; 677 NW2d 843 (2004) (quotation marks, brackets, and citations omitted).

[54] *Porter v Royal Oak*, 214 Mich App 478, 485; 542 NW2d 905 (1995).

[55] *Gorman v American Honda Motor Co, Inc*, 302 Mich App 113, 118-119; 839 NW2d 223 (2013).

[56] *Alan Custom Homes, Inc v Krol*, 256 Mich App 505, 512; 667 NW2d 379 (2003).

[57] *Kewin v Massachusetts Mut Life Ins Co*, 409 Mich 401, 419; 295 NW2d 50 (1980).

recoverable.[58]  This standard is applied when examining "the element of foreseeability to make out a prima facie case for lost profits."[59]

In this matter, however, the relevant claim is one of negligent misrepresentation.  If Ric-Man prevails on this claim, it is entitled to all damages that "are the legal and natural consequences of the wrongful act and are such as, according to common experience and the usual course of events, might reasonably have been anticipated."[60]  Ric-Man must establish "both causation in fact and proximate causation, the latter of which involves the question of whether the defendant should be held legally responsible for the injury."[61]  The cause-in-fact element requires a plaintiff to "present substantial evidence from which a jury may conclude that more likely than not, but for the defendant's conduct, the plaintiff's injuries would not have occurred."[62]  Such evidence must establish at least a reasonable probability that the defendant's negligent conduct caused the claimed injury.[63]  "[T]he legal concept of proximate causation depends in part on foreseeability, that is, whether the risk of harm to the victim was foreseeable and whether the result of that conduct and any intervening causes were foreseeable."[64]  "Proximate cause is that which operates to produce particular consequences without the intervention of any independent, unforeseen cause, without which the injuries would not have occurred."[65]  "To find proximate cause, it must be determined that the connection between the wrongful conduct and the injury is of such a nature that it is socially and economically desirable to hold the wrongdoer liable."[66]

Thus, while contract damages and tort damages encompass similar principles, the two are not identical.  Our Supreme Court, too, has viewed the two as distinguishable.[67]  "The doctrine [of collateral estoppel] is strictly applied in that the issues in both cases must be identical, and not merely similar."[68]  While there are similarities between the scope of damages available in contract and in tort, we cannot say that they are identical.

---

[58] *Lawrence v Will Darrah & Assoc, Inc*, 445 Mich 1, 13; 516 NW2d 43 (1994).

[59] *Id.*

[60] *Law Office of Lawrence J. Stockler, PC*, 174 Mich App at 33-34.

[61] *Id*. at 34.

[62] *Skinner v Square D Co*, 445 Mich 153, 164-165; 516 NW2d 475 (1994).

[63] *Id*. at 166.

[64] *Law Office of Lawrence J. Stockler, PC*, 174 Mich App at 34.

[65] *Helmus v Dep't of Transp*, 238 Mich App 250, 256; 604 NW2d 793 (1999).

[66] *Id.*

[67] See *Corl v Huron Castings, Inc*, 450 Mich 620, 629; 544 NW2d 278 (1996) ("Thus, in the face of this Court's reluctance to extend tort remedies to cases pleaded and proven in contract, we elect to continue to distinguish between tort and contract remedies.").

[68] *Keywell and Rosenfeld v Bithell*, 254 Mich App 300, 340; 657 NW2d 759 (2002).

Nor is the basis for the arbitration panel's ruling entirely clear. The arbitration panel's decision could be read as a finding that the claimed consequential damages did not result, as a factual matter, from the problems with NTH's designs. It could also be read as a finding that the OMIDDD did not foresee, or should not have reasonably foreseen, that NTH's errors would cause such damages. "Collateral estoppel applies only when the basis of the prior judgment can be clearly, definitely, and unequivocally ascertained."[69] That cannot be done in this case.

NTH's brief primarily addresses whether the breach of contract claims brought in arbitration were identical to the negligence claims brought in this matter. In this regard, we do not disagree with NTH. Clearly, the basis for the breach of contract claims against the OMIDDD was the same conduct that Ric-Man alleges was negligent in its suit against NTH. But the relevant inquiry is more specific. The precise issue is causation, and specifically, whether NTH's conduct caused Ric-Man's damages. Because the concept of causation in the breach of contract context is not perfectly identical to the concept of causation in the negligence context, that Ric-Man failed to demonstrate causation in the arbitration proceeding does not collaterally estop it from seeking the same damages here.[70]

## IX. STANDING AND DUTY TO MANCINI ENTERPRISES

In its cross-appeal, Ric-Man argues that the trial court erred when it found that Ric-Man could not pursue a claim of lost profits when those profits were lost not by Ric-Man, but by Mancini Enterprises. We find no error in the trial court's decision. This Court reviews "de novo both a trial court's decision to grant or deny a motion for summary disposition and issues concerning the application of the doctrine of collateral estoppel."[71]

We first address whether Ric-Man has standing to recover lost profits on behalf of Mancini Enterprises. [72] "Whether a party has standing is a question of law subject to review de novo."[73]

---

[69] *Ditmore v Michalik*, 244 Mich App 569, 578; 625 NW2d 462 (2001).

[70] We do wish to note our disagreement with Ric-Man's position on appeal. Ric-Man argues that mutuality of estoppel is missing in this case, and for that reason, collateral estoppel cannot apply. This argument is irrelevant because mutuality of estoppel is not required when collateral estoppel is asserted defensively, as it is here by NTH. *Monat*, 469 Mich at 691-692. We find no support for Ric-Man's belief that this rule does not apply when the prior proceeding is an arbitration.

[71] *Barrow v Pritchard*, 235 Mich App 478, 480; 597 NW2d 853 (1999).

[72] The theory behind this claim is as follows. Ric-Man explains that it is one of several companies owned by the same three brothers. One of these companies, Mancini Enterprises, develops real estate in Florida. According to Ric-Man, profits from Ric-Man may be sent to the other companies, including Mancini Enterprises, to use in that company's ventures. Ric-Man contends that because of the issues related to its work for the OMIDDD, it did not have profits to send to Mancini Enterprises, which would have been used by Mancini Enterprises to purchase

"An action must be prosecuted in the name of the real party in interest."[74] "A real party in interest is one who is vested with the right of action on a given claim, although the beneficial interest may be in another."[75] "This standing doctrine recognizes that litigation should be begun only by a party having an interest that will assure sincere and vigorous advocacy."[76]

In Michigan, "[i]t is a well-recognized principle that separate corporate entitles will be respected."[77] Even subsidiaries of a parent company are generally treated as separate corporate entities; it is only if "a subsidiary [has] become a mere instrumentality of the parent [that] its separate corporate existence will be disregarded."[78] "The doctrine of standing provides that a suit to enforce corporate rights or to redress or prevent injury to a corporation, whether arising from contract or tort, ordinarily must be brought in the name of the corporation, and not that of a stockholder, officer, or employee."[79] Here, there exist two distinct corporate entities: Ric-Man and Mancini Enterprises. Ric-Man has filed the instant suit, and it is the only named plaintiff. In part, Ric-Man seeks damages allegedly incurred by Mancini Enterprises in the form of lost profits. Ric-Man, which is not the real party in interest with regard to these damages, has no standing to recover those damages. Accordingly, the trial court properly held that Ric-Man could not seek to recover the lost profits of Mancini Enterprises.

Ric-Man first contends that the trial court erred in applying the standards for a motion brought under MCR 2.116(C)(8) because it failed to consider evidence, in the form of affidavits and testimony, that could have supported a conclusion that there was an inexorable flow of profits between Ric-Man and Mancini Enterprises. A motion brought under MCR 2.116(C)(8) is decided by looking only to the pleadings.[80] Assuming (as Ric-Man does) that this portion of the motion was decided under MCR 2.116(C)(8), the trial court would have erred had it done as Ric-Man wishes and considered evidence beyond the pleadings.[81]

Ric-Man primarily relies on *Mars, Inc v Coin Acceptors, Inc*,[82] a federal circuit court decision, as support for its belief that it may pursue a claim on behalf of a related, but separate

---

real estate in Florida. Because Mancini Enterprises did not purchase this real estate, it lost profits that could have been realized from the development of the property.

[73] *Groves v Dep't of Corrections*, 295 Mich App 1, 4; 811 NW2d 563 (2011).

[74] *Mich Nat'l Bank v Mudgett*, 178 Mich App 677, 679; 444 NW2d 534 (1989).

[75] *Id*.

[76] *Id*.

[77] *Seasword v Hilti, Inc*, 449 Mich 542, 547; 537 NW2d 221 (1995).

[78] *Id*. at 548 (quotation marks and citations omitted).

[79] *Belle Isle Grill Corp v Detroit*, 256 Mich App 463, 474; 666 NW2d 271 (2003).

[80] *Maiden*, 461 Mich at 119-120.

[81] In any event, what Ric-Man argues is that there exists evidence that its profits inexorably flow to Mancini Enterprises. The trial court assumed this was true for purposes of its decision.

[82] *Mars, Inc v Coin Acceptors, Inc*, 527 F3d 1359 (CA Fed, 2008).

-21-

corporation. *Mars, Inc* involved "standing and damages for patent infringement."[83] The patent at issue concerned technology used in vending machine coin changers.[84] While the plaintiff, Mars, owned the patent, its subsidiary, Mars Electronics International, Inc. (MEI), produced the coin changers, paying a royalty to Mars.[85] As damages in its patent infringement suit, Mars sought lost profits for lost sales of coin changers. On the motion of the defendant, Coinco, the district court dismissed this part of the claim for the reason that Mars itself did not sell coin changers, and thus, had not lost any sales.[86] In doing so, the trial court relied on *Poly-America LP v GSE Lining Tech, Inc*,[87] a case in which the federal circuit court held that "a patent holder is not entitled to recover under a lost profits theory as a result of sales lost by a sister corporation, absent a showing that the patent holder *itself* had lost profits."[88] The district court also concluded that "Mars's arrangement with [its subsidiary,] MEI[,] was a licensing arrangement, rather than an arrangement where profits flowed inexorably from MEI to Mars . . . ."[89]

On appeal, Mars argued that "by virtue of the parent-subsidiary relationship and its consolidated financial statements, all MEI's lost profits were *inherently* lost profits of Mars."[90] Mars sought to distinguish *Poly-America* on the basis that because of its corporate structure relative to MEI, MEI's profits flowed inexorably to Mars.[91] The circuit court rejected the argument, agreeing with the district court that the facts presented did not establish that, as a factual matter, MEI's profits flowed inexorably to Mars.[92] The circuit court then explained:

> Because we conclude that MEI's profits did not—as Mars argued—flow inexorably to Mars, we, like the *Poly-America* court, need not decide whether a parent company can recover on a lost profits theory when profits of a subsidiary actually *do* flow inexorably up to the parent. See *Poly-America*, 383 F3d at 1311 ("[I]t is not clear here whether Poly-America has itself suffered lost profits from the infringement, a matter that may be dealt with on remand . . . .") We hold simply that the facts of this case cannot support recovery under a lost profits theory.[93]

---

[83] *Id*. at 1362.

[84] *Id*.

[85] *Id*. at 1362-1363.

[86] *Id*. at 1362.

[87] *Poly-America LP v GSE Lining Tech, Inc*, 383 F3d 1303 (CA Fed, 2004).

[88] *Mars, Inc*, 527 F3d at 1365, citing *Poly-America LP*, 383 F3d at 1311.

[89] *Id*. (quotation marks omitted).

[90] *Id*. at 1367 (quotation marks omitted).

[91] *Id*.

[92] *Id*.

[93] *Id*.

Ric-Man contends that *Mars, Inc* stands for the premise that if one company's profits inexorably flow up to another company, the latter has standing to seek damages on behalf of the former. As is plain from the final paragraph quoted above, *Mars, Inc* specifically disclaimed creating such a rule. *Mars, Inc* is also distinguishable because it is a patent suit and because it involved a parent-subsidiary relationship, neither of which exists here. Further, *Mars, Inc*, as a decision of a lower federal court, is not binding on this court.[94]

Ric-Man contends that the principle it believes was recognized by *Mars, Inc*, is consistent with Michigan law. Ric-Man's contention is without merit. Ric-Man first compares this matter to agency law. Ric-Man explains that it, Mancini Enterprises, and several other companies are all owned by the same three brothers. Ric-Man contends that these companies hold themselves out as part of the same enterprise. Ric-Man then contends that it is an agent of the greater enterprise. Ric-Man explains that an undisclosed principal may sue for the breach of a promise made to the agent.[95] Ric-Man argues that the reverse should also be true, in that an agent should be able to sue on behalf of the undisclosed principal. Ric-Man contends that it was an agent to the greater enterprise, and as such, should be able to seek lost profits on behalf of Mancini Enterprises.

Ric-Man's argument contains a variety of flaws. First, it is premised on the existence of an agency relationship, which Ric-Man claims exists here with it serving as an agent to the collective enterprise. At an absolute minimum, any agency relationship must have two parties: an agent and a principal.[96] The collective enterprise for which Ric-Man purports to serve as an agent, however, exists only in Ric-Man's imagination. The purported enterprise does not exist in any legally recognized way. That the three brothers who own Ric-Man apparently hold out their group of companies as an enterprise does not create a legal entity. Thus, there exists no principal, and accordingly, no agency.

Even if the purported enterprise was a legally recognized entity, Ric-Man's argument makes little sense. Assuming that Ric-Man could seek redress on behalf of its principal, Ric-Man would be entitled to seek redress based on wrongs done to its purported principal, the collective enterprise. But that is not what Ric-Man seeks to do. Rather, Ric-Man seeks to recover the lost profits of Mancini Enterprises. Under Ric-Man's theory, Mancini Enterprises is but another agent of the collective enterprise. Thus, even accepting Ric-Man's argument, all that Ric-Man has shown is that there exist two agents of the same purported principal. We are

---

[94] *State Treasurer v Sprague*, 284 Mich App 235, 241-242; 772 NW2d 452 (2009). The parties do not dispute the fact that *Mars, Inc* has never been adopted by a Michigan appellate court. We have not found a single Michigan case citing *Mars, Inc*.

[95] See *Socomet, Inc v Detroit*, 33 Mich App 626, 632; 190 NW2d 551 (1971) ("[A]n undisclosed principal is entitled, as against third persons dealing with his agent, to the benefit of the agent's acts on his behalf.").

[96] See *St Clair Intermediate Sch Dist v Intermediate Educ Ass/MEA*, 458 Mich 540, 557; 581 NW2d 707 (1998) ("[I]n its broadest sense agency includes every relation in which one person acts for or represents another by his authority." (quotation marks and citation omitted)).

unaware of any authority, and Ric-Man cites none, permitting an agent to seek damages on behalf of another agent.

The second comparison drawn by Ric-Man is to the common control doctrine recognized in the context of ERISA and the MPAAA. As explained by the United States District Court for the Eastern District of Pennsylvania:

> ERISA was enacted in 1974 to address the increasingly-apparent insecurity of workers' vested pension funds. Among its many provisions, ERISA required employers to make contributions that would produce pension plan assets sufficient to meet future vested pension liabilities and if a plan became insolvent, made any employer who had withdrawn from the plan during the previous five years liable for a fair share of the plan's underfunding.
>
> Under ERISA as originally enacted, therefore, an employer could withdraw from an underfunded pension plan without any responsibility for the underfunding, as long as the plan remained solvent for five years after the withdrawal. This liability structure encouraged an employer to withdraw from a financially shaky plan and risk paying its share if the plan later became insolvent, rather than to remain and (if others withdrew) risk having to bear alone the entire cost of keeping the shaky plan afloat.
>
> To correct this problem, Congress passed the MPPAA in 1980 and imposed a withdrawal charge on all employers withdrawing from an underfunded plan (whether or not the plan later became insolvent). This withdrawal liability represented the pro rata share of the unfunded vested liability remaining in the fund at the time of withdrawal, subject to certain adjustments. The provision of the MPPAA establishing this liability is 29 U.S.C. § 1381(a): "If an employer withdraws from a multiemployer plan in a complete withdrawal or a partial withdrawal, then the employer is liable to the plan in the amount determined under this part to be the withdrawal liability."[97]

By statute, both the employer and other businesses under the common control of the employer are liable for this withdrawal liability.[98] Ric-Man contends that under this common control doctrine, it may be held liable for any withdrawal liability that might be owed principally by Mancini Enterprises. Ric-Man reasons that if it could potentially be held liable in such a way, it should also be able to seek damages on behalf of Mancini Enterprises. Simply put, the matter before this Court has absolutely nothing to do with ERISA, the MPPAA, or the federal statute holding those within the common control of an employer liable for the employer's withdrawal liability under those statutory schemes. Nor is there any logical reason to conclude that because

---

[97] *Brown v Astro Holdings, Inc*, 385 F Supp 2d 519, 527 (ED Pa, 2005) (quotation marks and citations omitted).

[98] 29 USC § 1301(b)(1). See also *Brown*, 385 F Supp 2d at 528.

Ric-Man could possibly be liable for Mancini Enterprises's withdrawal liability, it is vested with the right to recover lost profits on behalf of Mancini Enterprises. The argument has absolutely no basis in law or logic.

The trial court also rejected Ric-Man's attempt to seek lost profits on behalf of Mancini Enterprises for a second, independent reason: that NTH owed no duty to Mancini Enterprises.[99] Ric-Man contends that this conclusion is erroneous because "the law of agency imposes a duty upon NTH to an undisclosed principal . . . ."[100] Ric-Man explains that as a general matter, undisclosed principals are common in the construction field, and because of that fact, NTH should have foreseen that Mancini Enterprises could be harmed by NTH's design defects. But there simply is no agency relationship here. As discussed, there can be no agency relationship with the purported enterprise because there is no such entity. To the extent Ric-Man can be understood as arguing that Mancini Enterprises was an undisclosed principal in relation to the Prime Contract, this argument clearly fails. Ric-Man contracted with the OMIDDD purely on its own behalf. Ric-Man was to perform all obligations under the Prime Contract. Mancini Enterprises was in no way a part of the agreement between Ric-Man and the OMIDDD. Ric-Man fails to demonstrate the existence of any duty owed to Mancini Enterprises.

## X. LEAVE TO AMEND

Finally, Ric-Man asks this Court to either direct the trial court to grant its requests for leave to amend its complaint, or to direct the trial court to consider the requests, which were made pursuant to MCR 2.116(I)(5). We see no need for such a directive. "This Court reviews a trial court's decision regarding amendment of a complaint pursuant to MCR 2.116(I)(5) for an abuse of discretion."[101]

In its response to the motion for summary disposition, Ric-Man asked that in the event any portion of the motion were granted, Ric-Man be allowed an opportunity to amend its complaint pursuant to MCR 2.116(I)(5). Under this court rule, if a motion is granted pursuant to MCR 2.116(C)(8), (C)(9), or (C)(10), the trial court "shall give the parties an opportunity to amend their pleadings as provided by MCR 2.118, unless the evidence then before the court shows that amendment would not be justified." The trial court granted summary disposition with regard to the claim of lost profits incurred by Mancini Enterprises, but did not specifically rule on the question of whether Ric-Man would be able to amend its complaint. Then, in Ric-Man's motion for reconsideration, Ric-Man again requested that as an alternative to reconsidering its

---

[99] Whether a defendant owes a plaintiff a duty of care is a question of law, reviewed de novo on appeal. *Fultz*, 470 Mich at 463.

[100] Michigan does recognize that an undisclosed principal may "claim the benefit of a contract, maintain an action thereon, and enforce any remedies which might have been pursued by the agent himself . . . ." *Grand Rapids Milk Producers Ass'n v McGavin*, 295 Mich 477, 481; 295 NW 232 (1940).

[101] *Liggett Restaurant Group, Inc v City of Pontiac*, 260 Mich App 127, 138; 676 NW2d 633 (2003).

holding, the trial court provide Ric-Man with the opportunity to amend its complaint to add Mancini Enterprises as a plaintiff. Once again, the trial court did not specifically rule on the request. However, at no point did Ric-Man file a motion seeking leave to amend its complaint, nor did it present the trial court with a proposed amendment.

Ric-Man now asks this Court to remand the matter and direct the trial court to either grant leave to amend, or to consider Ric-Man's "numerous requests for leave to amend its complaint." We do not see the necessity of such a directive. Ric-Man has never filed a motion for leave to amend. It has explained only that an amendment would add Mancini Enterprises as a plaintiff. Ric-Man states that such an amendment would cure most or all of the defects with the lost profits claim, but that does not appear to be the case. For example, simply naming Mancini Enterprises would not change the fact that Ric-Man has yet to identify a legally recognized duty owed by NTH to Mancini Enterprises. Issues may also arise related to the statute of limitations. Under the circumstances, it is not at all clear that an amendment to the complaint is warranted.

Nor do we find it necessary to direct the trial court to consider the requests made by Ric-Man. The trial court has never indicated that it would refuse to consider a proper motion for leave to amend the complaint. When the matter returns to the trial court, Ric-Man can file such a motion. The parties (and ultimately, the trial court) would then have an opportunity to explain why leave to amend should or should not be granted. But absent any indication from the trial court that it would not consider such a motion, there is no need for further action by this Court.

Affirmed in part, reversed in part, and remanded for further proceedings consistent with this opinion. We do not retain jurisdiction.

/s/ Michael J. Talbot
/s/ Kathleen Jansen
/s/ Joel P. Hoekstra